F. K. MYERS, Administrator of the Estate of ABBY MYERS, deceased, Appellee, v. CHICAGO, BURLINGTON & QUINCY RAILROAD COMPANY, Appellant.

**Actions:** CHANGE OF PARTIES BY SUBSTITUTION. One suing in his individual right may amend his petition, where the facts warrant it, and maintain the action in a representative capacity without effecting a substantial change in the cause of action. Under this rule an action brought by a husband for the loss of companionship caused by the wrongful death of his wife may be amended by substituting a third person as administrator and asking damages to her estate.

**Railroads:** TRESPASSER: NEGLIGENCE: EVIDENCE. One walking upon a railroad track is a trespasser to whom the company owes no duty until his peril is discovered.

In this action the question of whether trainmen, having observed deceased upon a trestle, could have stopped the train in time to have avoided the accident, was under the evidence for the jury.

**Same:** CONTRIBUTORY NEGLIGENCE. It is also held that under the evidence the question of what an ordinary person in deceased's situation, conscious of an approaching train would, in the exercise of ordinary prudence have done, was for the jury.

**Same:** NEGLIGENT DEATH OF WIFE: INDEPENDENT OCCUPATION: EVIDENCE. Ordinarily the services of a wife belong to the husband, and unless she was engaged in a separate occupation her death can not be said to have occasioned loss to her estate. In this action by the administrator for damages on account of the negligent death of the wife, the evidence is held to require a submission of the question of whether she pursued a separate occupation.

**New trial:** MISCONDUCT IN ARGUMENT. While impropriety in argu-

ment to a jury which tends to the prejudice of a party will not be upheld, still too great nicety in the choice of language will not be exacted, especially when the remarks are of a responsive character.

Evans, J., dissenting.

*Appeal from Mills District Court.*—HON. W. R. GREEN, Judge.

SATURDAY, JUNE 10, 1911.

ACTION for damages resulted in judgment against defendant, from which it appeals.—*Affirmed.*

*Arthur E. Wells* and *W. S. Lewis,* for appellant.

*Gilliland & Logan* and *Genung & Genung,* for appellee.

LADD, J.—This action was first begun by William Myers, who claimed damages for loss of consortium as the result of the alleged wrongful acts of defendant's employees causing the death of his wife. A demurrer to the petition having been sustained (see *Seney v. Railway,* 125 Iowa, 290), an amended and substituted petition was filed by F. K. Myers, as administrator of the decedent, claiming damages to her estate. Defendant moved that this be stricken for that it changed parties plaintiff and alleged a new cause of action. This motion is overruled and exception is taken thereto, though answer subsequently was filed. Where a party sues in his own right he may, if the facts warrant, amend his complaint so as to make the suit stand in his representative capacity, and conversely, if he sues in his representative capacity, he may be allowed to amend by declaring as an individual; and in either instance it is not considered a substantial change of the cause of action. *Hunt*

1. ACTIONS: change of parties by substitution.

*v. Collins,* 4 Iowa, 56; *Hume v. Kelley,* 28 Or. 398 (43 Pac. 380); *Smith v. Anderson,* 39 Texas, 496; *Buffington v. Blackwell,* 52 Ga. 129; 1 Ency. P. & P. 538.

In *Wells v. Stombock,* 59 Iowa, 376, a township had brought suit, and when a demurrer to the petition was sustained on the ground that a township was without capacity to sue, the plaintiff, as township clerk, was allowed to file an amendment to the petition asserting his right to maintain the cause of action alleged in the petition. The ruling was approved, the court, through Seevers, C. J., saying, in response to the suggestion that, as there was no plaintiff named, there was no petition to amend:

We think when there is an appearance to the action, and the defendant tests the right of the named plaintiff to maintain the action by a demurrer, and the latter is sustained, the name of the proper parties plaintiff may be substituted in the action by an amended petition, subject, of course, to an apportionment of the costs and the right of the defendants to a continuance if taken by surprise. If this is not the rule, the action must abate and another be brought. This, under the statute, should not be the rule unless substantial justice so demands. The statute in terms provides the court in furtherance of justice may permit a party to amend any pleading 'by adding or striking out the name of a party . . . or by inserting other allegations material to the case, or, when the amendment does not charge substantially the claim or defense, by conforming the pleadings or proceedings to the facts proved.' Code 1873, section 2689.

There the original plaintiff was without capacity to sue; here, though with capacity, he might not maintain the action. In each case the transaction on which action was based remained unchanged. Had the original plaintiff been substituted as administrator of the estate of decedent, there could be no doubt of the propriety of the ruling permitting this to be done, and we are inclined to the view that the substitution of another as such administrator is within the rule of the above decision, and, in the circumstances dis-

closed, ought not to be regarded as such an abuse of discretion that, after answer and judgment on the merits, a new trial should be ordered. We do not overlook the general rule which limits the right to amend from making an entire change of the parties on either side and stops short of the introduction of an entirely new cause of action. *State v. Turner,* 96 N. C. 416 (2 S. E. 51); *Steed v. McIntyre,* 68 Ala. 407. Nor do we forget that reversals are not to result from technical errors which could not have prejudiced either party in the progress of the trial. The ruling, however, is not without other support. See *Wood v. Lenawee, Circuit Judge,* 84 Mich. 521 (47 N. W. 1103), where the court held that in an action on a policy of life insurance by the administrator of the estate of a person not entitled thereto, the real parties interested might be substituted as plaintiff by an amendment, though at the time an independent suit by them would have been barred. Though to have sustained the motion would not have been error, overruling it was not prejudicial to the rights of the parties, and therefore is not ground for reversal.

II. Appellant contends that the evidence was insufficient to sustain the finding that the collision was due to the negligence of its employees. It appears that in the morning of July 17, 1909, Abby Myers and her daughter Hazel, then about fourteen years of age, left Glenwood for Pacific Junction by train at 6:30 o'clock. Upon reaching that place they walked out along defendant's railway on the way to the home of another daughter about two and one-half miles distant. Arriving at a trestle 1,070 feet long, they rested, and then, as no train was heard coming, proceeded on their way. When about half way over the trestle they heard a whistle and hurried on in order to get across before the train reached them. According to Hazel's testimony, "When the train came around the bend, it whistled a long and a short whistle, and then, when it got up to the bridge,

2. RAILROADS: trespasser: negligence: evidence.

it whistled the alarm." This was followed by several short blasts, and when the train reached the end of the bridge about twenty-two feet away, she jumped from the trestle into the water below, about ankle deep, and, on alighting, saw her mother hurled through the air and fall about ten feet east of her. Quoting: "When the engineer first sounded the alarm just before I jumped off the trestle, I think the engine was right at the bridge. I could not tell just the distance. There were no sharp whistles sounded I know of before the engine was at the bridge, and this was just before I jumped. . . . I do not think I can recollect how far the engine was away or how far the train was from me when I jumped. I was so frightened and confused at the time, I am unable to give the distance." As she jumped her mother, though frightened, was erect and moving forward. This trestle or bridge was covered with cinders and was about eight feet above the surface. There was a highway crossing 1,045 feet west of the west end. The whistling post was 1,633 feet beyond this crossing. The railway over the trestle and to this whistling post was straight and from there on curved to the southwest. The train consisted of the engine, tender and fifty-nine cars, all but ten or eleven of which were heavily loaded. The train as it came around the curve was moving at the speed of twenty-five or thirty miles an hour, and the engineer at that time first observed some object on the track but could not distinguish what at that distance, nor determine whether on the trestle. As soon as he got on the direct line he noticed, according to his testimony, that the objects ahead were human beings, but as the ballasting was the same on the trestle as on the roadbed he could not yet detect whether they were west of the trestle or on it. Upon reaching the highway crossing he noticed that the two persons were women at or near the trestle, and, according to his testimony, he immediately "applied the air, in the emergency, and opened the sand boxes," thereby doing

everything possible to stop the train.  He testified that when it finally stopped "eleven cars were on the trestle."  He further testified:  "I whistled twice for the road crossing, and they did not seem to get off the track.  That was before I struck the crossing and west of the road crossing.  I had whistled twice.  They didn't seem to move.  They didn't seem to get off the track.  When I got at the road crossing I set my air in the emergency, and I sounded the stop alarm or the short blasts.  I kept up the short blasts.  I began this as soon as I set my air in the emergency, and I kept this up until I was right on the bridge.  I kept my eyes on these women.  When I got within about ten or twelve cars length of the woman, she dropped down in the center of the track on the left side near the left rail, as if fainting or something like that.  I should say the engine was probably ten or twelve cars length away from her when she seemed to drop down.  There is about thirty-eight feet to the car.  I could see her until the engine was probably two or three cars length away.  The little girl was running toward the end of the bridge the last I saw of her.  When Mrs. Myers sank down, I would say she was not over ten feet from the end of the bridge."  From the bridge over the Missouri river east is down grade until reaching the curve mentioned, and from there on appears to have been nearly level.  The engineer had shut off steam at the curve and was allowing the train to drift.  The evidence of the other trainmen tended to corroborate the story of the engineer and to show that Hazel, instead of jumping from, ran off the trestle at the west end.

There was evidence tending to show that neither Hazel's shoes nor her dress were wet or muddy, and that the mother's body fell about seventeen feet east of the end of the trestle.  The evidence was such as to carry the issue as to defendant's negligence to the jury.  The decedent and her daughter were trespassers, to whom the defendant owed no duty save upon observing their situation.  The engineer

saw objects on the track as the engine turned the curve, and
as it came from the curve on the straight line he recog-
nized these as human beings, but could not determine
whether they were on the trestle. As the whistle blew for
the highway crossing, 2,682 feet from the trestle, he could
not see them move. This indicated they were coming to-
ward him if moving. He kept his eyes on them, but for
what purpose, if not to enable him to stop his train, if
necessary, to avoid a collision? And yet he made no effort
save to turn off the steam, to reduce the speed of this
rapidly moving train, which he must have known could not
have been readily stopped until the engine reached the
highway crossing but 1,047 feet from the end of the trestle,
or so near that, according to his testimony, he could not
have stopped before reaching it. Hazel testified that the
engine was much nearer when the air was applied to the
brakes, for, according to the engineer, this was done as
the short blasts began. She also testified that the engine
when it stopped was east of the trestle, and defendant's em-
ployees were of opinion the train was moving fifteen miles
an hour when it struck decedent. If her story is to be be-
lieved, the engineer did not apply the brakes until near the
trestle and long after he must have been aware of de-
cedent's peril. The engineer thought such a train might be
stopped within thirty-five car lengths; the fireman esti-
mated the distance from thirty to forty cars. On the other
hand, Groom, who had been an engineer for sixteen years,
though when but one-fifth of the cars had air brakes, esti-
mated that such a train might be stopped in moving one-
half its length. One Hamilton, whose experience did not
justify much weight being given to his testimony, fixed the
distance at three hundred feet. He had worked as fireman
four years from 1900, but testified that fifty-nine cars were
not being handled in a train at that time, and that he had
never fired on an R. 5. engine, but had on an R. 4., and
that he had never run an engine. The jury might have

found the average length of cars thirty-eight feet, and unless the testimony of Hamilton were relied on, that the train must have moved 1,100 to 1,200 feet after the application of air before stopping.  If the train must have moved this distance, the engineer, in the exercise of ordinary care for the protection of human life, should have slowed his train before reaching the highway crossing, so that if it turned out that the decedent and her daughter were on the trestle, the engine might have been stopped in time to have avoided the injury.  He ought not, after observing them, to have speculated on whether they were on the trestle or might get off until the engine had come so near that a collision could not in all reasonable probability be avoided.

In view of the uncertainty as to when the air was turned on and the distance within which the train might have been stopped, and whether the engineer ought not to have slowed his train before reaching the highway crossing, the issue as to whether in the exercise of ordinary care he ought to have stopped the train in time to avoid the collision was for the jury.

III.  As the train neared decedent, she appeared to have collapsed from fright or some other cause, and appellant contends that but for this she would have reached the end of the trestle in safety.  If she was twenty-two feet therefrom, as testified by her daughter, the jury might have found she could not have done so, and must have escaped, if at all, by jumping from the bridge.  The trestle was about eight feet high at that point, and likely she did not know the depth of the water below.  What a person so situated and exposed to the menace of an on-coming train, with alarms sounding, in the exercise of ordinary prudence should have done, was for the jury to say.

3. SAME: contributory negligence.

IV.  Ordinarily, the services of the wife belong to the

husband, and therefore, unless she is engaged in an inde-

4. SAME: negligent death of wife: independent occupation: evidence.

pendent occupation, her death can not well be said to have occasioned loss to her estate. *Tuttle v. Railway*, 42 Iowa, 518; *Nichols v. Railway*, 68 Iowa, 732.

Appellant contends that the evidence fails to show that decedent pursued an independent calling even in part. It was somewhat meager. William Myers testified that she had taken in washing, but not during the eighteen months prior to her death; that she had helped him in his tailor shop, for which she received no compensation; that she had earned from $3 to $7 nearly every week at washing and used the money as she pleased; that she had not been taking in washing recently because of not being well, due to change of life, but had about recovered; that prior to November 1, 1906, he was absent two years and nine months, and so far as he knew his wife earned the support of the family in his absence. Hazel testified to her mother taking in washing, receiving the money therefor, and that she bought clothes for the family with it. The jury might have found from this that decedent had an occupation separate and apart from her household duties which she had followed until her health was impaired. She had collected her earnings, as she was entitled to under the law, and it was inferable from the evidence adduced that she would resume the work at which she had been engaged upon the complete restoration of her health. That she had been assisting her husband in the shop was a circumstance tending to indicate the abandonment of an independent employment, but whether she had done so was for the jury to say. Though the employment she had been engaged in may have been humble, if separate and apart from that of her husband, and she received the emoluments, this was sufficient to make out a case for the jury. *Flemming v. Shenandoah*, 67 Iowa, 505; see *Bailey v. Centerville*, 108 Iowa, 20.

The court rightly instructed that the mere fact, if it be a fact, that she was not at the time of the accident pursuing this occupation would not be sufficient to defeat a recovery, if it was found that she had been prevented by a temporary illness from which she would have recovered, but for her death; and but for the accident in question she would have resumed and continued such occupation.   The status of the law which denies a cause of action to the husband because of the wrongful death of the wife when instantaneous and refuses damages to the administrator unless she pursued a separate vocation does not especially commend itself to modern standards of justice, and, to avoid the apparent hardship, courts are not inclined to scrutinize too closely evidence of independent employment, but to uphold the conclusion a jury may reach if an inference to that effect may be drawn from all the evidence adduced.   The issue was for the jury.

V.   Complaint is made of the alleged misconduct of counsel.   Whatever was said of an objectionable nature appears to have been in response to arguments of counsel for appellant.   That counsel referred to the crew on defendant's train as a "gang" instead of a crew can scarcely be thought misconduct. While impropriety tending to the prejudice of a party must be avoided even in argument, too great nicety in the choice of words ought not to be exacted.   There was no error.

5. NEW TRIAL: misconduct in argument.

VI.   The decedent was forty-two years of age and the mother of seven children.   Her expectancy according to the life tables was 26.75 years.   She had earned but $3 to $7 per week when working independently, and conceding that upon recovery of her health she would have resumed her vocation of taking in washings, the extent of her earnings was somewhat problematical.   She had accumulated no estate at the time of her death, and whether she would have done so no one can say.   In other words, the record was such as to leave the inquiry as the injury to her estate

largely one of conjecture, but this necessarily must be so of all matters involving the future, and especially with reference to those relating to the probable accumulation of property. We are not inclined to interfere with the verdict, and the judgment is *affirmed*.

EVANS, J. (dissenting).—I am not able to concur in the majority opinion. The facts involved are very distressing and tend to the discomfiture of cold judgment. I do not think that the record discloses any evidence of negligence on the part of the engineer after he had discovered the peril of the deceased. I do not think that it can be said that there is anything in this record to dispute the .statement of the engineer as to the efforts made by him to stop as soon as he discovered that human beings were in peril. It seems to me, also, that his statement in the matter is fully corroborated by all the circumstances shown.

Nor am I able to say that the deceased had an independent occupation at the time of the accident. The showing is that she had done washing for the support of the family during her husband's absence for two years or more prior to November 1, 1906. She had not engaged in that occupation to any extent after that date. There is a statement of the husband as a witness that this was because her health was poor. This was a mere conclusion of the witness at best. But taking it for what it was worth, and assuming that it was competent thereby to prove the reason why the wife had given up such occupation, the fact remains that she had given it up. The majority opinion at this point is predicated upon the theory that there was sufficient evidence from which an inference could be .drawn, that she would resume the occupation when her health would permit. I can find no evidence in the record tending in any degree to show an intent on her part to resume such occupation at any future time. I take it that the majority deem the testimony of the husband, as set forth in the

opinion, as being sufficient for that purpose. I am unable to come to this view, and I therefore respectfully note my dissent.