L. W. Basham, Administrator, Appellee, v. Chicago Great Western Railway Company, Appellant.

**RAILROADS:** Accidents to Trains—Negligence—Res Ipsa Loquitur
1  —Derailing of Engine—Burden of Proof. An accident and its attendant circumstances, without more, may furnish substantive, prima-facie evidence of negligence, and shift the burden of proof to defendant to show that he was not negligent in fact. In other words, *accidents may have accusing tongues.* So held where an engine was derailed by an open, unattended switch, which was in the *exclusive charge and control* of the defendant.

**MASTER AND SERVANT:** Action for Negligence—Prima-Facie
2 Case—Negligence—Evidence of Care—Ultimate Question for Jury. A state of evidence that would so completely overthrow

an established prima-facie case of negligence (even when made rnder the doctrine of *res ipsa loquitur*) as to render the question of negligence *one of law for the court*, would be very unusual.

PRINCIPLE APPLIED: Plaintiff showed that an engine was derailed by an open, unattended switch, and that the intestate, the engineer, was killed, thereby establishing a prima-facie case of negligence on the part of defendant. Defendant contended that its showing of care, oversight and inspection of the switch, and the fact that another engine passed safely over the switch a few minutes before the accident, overthrew, *as a matter of law*, the prima-facie showing of negligence. *Held*, the ultimate question of negligence must remain with the jury.

APPEAL AND ERROR: Harmless Error—Immaterial Evidence of 3 Conceded Fact. A concession that a certain fact existed at the time material to the controversy neutralizes and renders harmless a prior reception of evidence tending to show the existence of the same fact at a remote and immaterial time. So held with reference to the practice of employees' carrying keys to a switch.

WITNESSES: Cross-Examination—Matters in Chief—Discretion of 4 Court. A reversal may rarely be expected because evidence pertinent to the issue, though strictly matter in chief, is brought out on cross-examination.

LIMITATION OF ACTIONS: Commencement of Action—Amend-5 ment. Presenting New Cause of Action. Petitions in actions commenced before the statute of limitations has run, may, as a rule, be amended to any extent, so long as the amendment does not have the effect of converting the theretofore pending action into a new and independent action. *Held*, a petition for recovery for death under the Federal Employers' Liability Act might be amended after the expiration of two years from the date of the injury and death, by alleging "that deceased left a surviving dependent wife and that the action was brought for her benefit."

NEGLIGENCE: Contributory Negligence—Open Switch—Right of 6 Engineer. An engineer, in approaching a switch, while obligated to keep a reasonable outlook for danger, has a right to presume that the defendant and its employees have done their duty in maintaining the switch in proper condition. Engineer held not guilty of contributory negligence.

TRIAL: Verdict—Excessiveness—$11,150. Verdict of $11,150 sus-7 tained. Deceased, 61 years of age, was an experienced engineer, was earning $175 a month, was in good health, was temperate and saving, and had a life expectancy of some 13 years.

*Appeal from Polk District Court.—C. A. DUDLEY, Judge.*

FRIDAY, NOVEMBER 26, 1915.

REHEARING DENIED FRIDAY, APRIL 7, 1916.

REHEARING DENIED MONDAY, DECEMBER 18, 1916.

ACTION at law to recover damages for the death of plaintiff's intestate. There was a trial to a jury, and verdict and judgment for plaintiff. Defendant appeals.—*Affirmed.*

*Carr, Carr & Evans,* for appellant.

*Clark, Byers & Hutchinson* and *Thomas A. Cheshire,* for appellee.

WEAVER, J.—The deceased was in the employ of the defendant railway company as a locomotive engineer, and at the time of his death was operating an engine hauling a passenger train over defendant's line between Des Moines and Oelwein. On March 28, 1910, deceased left Des Moines with his train, which was due to arrive at Oelwein at 2:30 P. M. About half a mile from Oelwein, and on the line leading from Des Moines, is a switch for a track leading off from the main line into defendant's yards. At the time in question, it is conceded that this switch was unlocked and open sufficiently to break the connection with the rails upon the main line. There was no one then present at the switch, and nothing to warn the deceased of the danger thus created, unless it were the position of the target. Evidently he did not discover the defect in time to stop, with the result that the engine was derailed and overturned, and the engineer so crushed that he died on the following day.

The issues as finally settled were as follows: Plaintiff, as the administrator of Spellman's estate, alleges that the

death of the intestate was caused by defendant's negligence in failing to maintain a reasonably safe track, and in carelessly leaving the switch open; and he demands a recovery of damages for the benefit of the widow, under the provisions of the act of Congress providing for recovery in such cases, where the deceased was engaged in the work of interstate commerce. The defendant denies the claim, says the engineer was himself guilty of negligence, and that the right of action, if any, is barred by the statute of limitations. Further reference to the pleadings will be made in a later paragraph of the opinion.

At the close of the testimony, defendant's motion for a directed verdict was denied. The jury returned a verdict for damages in plaintiff's favor, and a special finding to the effect that the switch had been left open by the employes and agents of the defendant.

Spellman was an experienced engineer, and had been in the employ of the defendant for 22 years. At the time of his death, he was about 61 years old, had been married about 35 years, and was the father of three children, all of whom survived him, and had arrived at their majority. Prior to the bringing of this action, the children, being all the heirs at law of the deceased, united in a writing by which they assigned and transferred to the widow any and all interest which they had in the estate of their father, including therein all their right and interest in the claim for damages on account of his death.

Concerning the circumstances immediately attending the derailment of the engine, it is conceded that the switch was unlocked and partly open, causing the wheels to leave the track. The following cut is made from a photograph of the switch stand, and its inspection will make clear the situation.

From the top of the stand arose a rod or staff, only partially shown in the cut. At the top of the staff was a lamp for use at night, and below the lamp, a red arrow or pointer.

When properly set for the main line, the switch was held in place by an iron plunger at the lower end of the staff, dropped into an opening of the frame or body of the stand. This opening was square in form, and the plunger was squared to fit into it. A lever or handle was attached to the upper end of the plunger, which lever, when the switch was closed, hung down upon the side of the stand. To work the switch, the operator lifted the handle, raising the plunger out of the socket; then, by swinging the lever horizontally, the switch points or ends of the movable switch rails were carried around into connection with the main or side track, as might be desired. The mechanism of the stand was so adjusted that, when the switch was set for either line, the plunger would fit into the socket; but when lifted out, it required a swing of 90 degrees of the lever to bring it into position for the other connection, and allow the plunger to again fit the socket. When in position for either track, the plunger, being in the socket, held the rails in connection; but if the lever, being lifted, was swung to any extent less than 90 degrees, the plunger, not being in position for the socket, would rest on the top of the stand, and could not effectually prevent movement of the switch points. The staff carrying the lamp and arrow was so attached to the stand as to turn with the horizontal movement of the lever; and, when the switch was fully opened for the side track, the arrow signal stood at right angles to the main track, and served as a warning to train men approaching on the main line; but when the switch was set for the main line, the signal stood parallel with that line, and was invisible to the train men. It should also be said that the switch stand was provided with a padlock, by which, when not in use, or unattended by a switchman, the lever could be secured to the side of the stand, as a protection against interference or misuse by unauthorized persons. It is obvious from the foregoing statement that if, as both parties seem to concede, the

switch was unlocked and the plunger lifted and resting out
of place, the warning signal would not be fully displayed
to the main track, the obscurity being in proportion to near-
ness of the lever to the main track connection. It was the
opinion of railroad men, expressed on the trial, that the
plunger, when in place, even though unlocked, could not be
thrown out of the socket by the jar or vibration of passing
trains; but it would seem clear to the nonexpert mind that,
if the plunger was out and resting on the top of the stand
when the engine was wrecked, the extent of the opening or
displacement, as found by the witnesses after the wreck
occurred, would not necessarily indicate the exact position of
the switch points when the engine struck them. In other
words, assuming that the switch was partly open and freed
from the restraining effect of the plunger when in place, it
would appear quite possible that the extent of the discon-
nection and displacement of the switch points may have been
materially increased or diminished by the impact of the engine
as it struck and passed over the defect in the track. This
feature of the situation was material in its bearing upon the
circumstance, to which we shall again refer, that another
engine had passed this switch in safety but a short time
before the accident. It is also to be considered as bearing
upon the extent to which the danger signal was displayed,
and therefore upon the question whether the deceased was in
the exercise of due care. The fireman, who alone was with
the deceased at the time of the accident, says that, as they
approached the switch, at a distance of about 200 feet, he dis-
covered something wrong with the target, and called the
attention of the engineer, who looked, and applied the air
brake, but too late to make the needed stop. He says:

"The rail was what I took to be half and half—the
switch was lined up for neither one or the other."

I. Such being the admittedly defective condition of the
place at the time deceased arrived with his train, we have

first to ask whether there is evidence to take the case to the

1. RAILROADS: jury upon the question of the defendant's
negligence: *res* alleged negligence. That such evidence does
*ipsa loquitur*:
derailing of appear, we have no doubt. Even if we should
engine: burden
of proof. disregard matters of fact upon which there
is a conflict in the evidence, the circumstances upon which
there is no dispute—that the switch, upon the proper place-
ment and maintenance of which depended the safety of every
passing train, was in the exclusive charge and control of the
defendant and its agents; that it stood unattended, unlocked
and open, in a position to create a death trap into which
an approaching train, freighted with living persons, was
liable to plunge; that the intestate's engine was in this man-
ner derailed and he himself fatally injured; that accidents
of this nature do not ordinarily occur if due care be used by
the railway company, its agents and employes; and that
defendant was in duty bound to exercise all reasonable care
to furnish a safe track over which to operate its engines—
make up a record from which a jury may properly draw an
inference that there was a breach of defendant's duty in this
respect. In other words, it makes a case for the application
of the maxim *res ipsa loquitur,* as the same is now generally
understood and applied, and constitutes a prima-facie show-
ing sufficient to sustain a verdict in plaintiff's favor. This
rule is entirely consistent with the fundamental proposition of
the law of negligence: that, in order to recover on account of
the want of due care on the part of a defendant, the plaintiff
assumes the burden of proof, and that proof of the mere fact
of his injury is insufficient to sustain a finding in his favor.
In all cases, he must offer competent evidence, from which the
jury may fairly and justly find the defendant wanting in the
the proper measure of care. This he is not required to do by
direct, positive evidence of eyewitnesses to the alleged negli-
gent act, but it is sufficient to make a case for the jury on
this question if he shows facts from which a reasonable infer-
ence of the alleged negligence may be drawn.

"If the facts proved make it probable that the defendant neglected its duty, it is for the jury to decide between them." *Greenleaf v. Illinois Cent. R. Co.*, 29 Iowa 14, 46.

*Res ipsa loquitur* does not release the plaintiff from proving his case, but defines in a general way one mode of proving it, and what shall be prima-facie evidence of negligence. 2 Labatt's Master & Servant (1st Ed.), Sec. 834.

The following statement of the rule by the Vermont court is quite clear and satisfactory:

"Where an accident has occurred and the physical facts surrounding it are such as to create a reasonable probability that it was the result of negligence, in such case, the physical facts themselves are evidential, and furnish what the law terms evidence of negligence, in conformity with the maxim *res ipsa loquitur.*" *Houston v. Brush*, 66 Vt. 331.

A leading text writer puts it as follows:

"Though it is not every accident that will warrant an inference of negligence, yet it is not true that no accident will suffice for this purpose. If the plaintiff proves that he has been injured by an act of the defendant, of such a nature that in similar cases, where due care had been taken, no injury is known to ensue, he raises a presumption against the defendant, which the latter must overcome by evidence either of his carefulness in the performance of the act or of some unusual circumstance which makes it at least as probable that the injury was caused by some circumstance with which he had nothing to do, as by his negligence." Shearman & Redfield on Negligence. (3d Ed.), Sec. 13.

Frequently it is stated as follows: If the plaintiff, being in his rightful place and in the exercise of due care, is injured by reason of some defect in the condition or management of some instrumentality which is in the exclusive possession and control of defendant, and the accident is such as, in the ordinary course of events, does not happen if reasonable care is used to prevent it, such showing affords sufficient evidence to justify a jury in finding that the injury was caused by

defendant's negligence.  *Tuttle v. Chicago, R. I. & P. R. Co.,*
48 Iowa 236; *Grant v. Raleigh & G. R. Co.,* 108 N. C. 462;
*Scott v. London & St. K. Docks Co.,* 3 Hurlst. & C. *596; *Breen
v. New York Cent. & H. R. R. Co.* 109 N. Y. 297; *Bahr v.
Lombard,* 53 N. J. L. 233.

That the case at bar comes well within the scope of this
rule is quite self-evident.  The defendant's track and switches
are part of its equipment for the more or less constant move-
ment of heavy engines and trains.  They are instrumentali-
ties peculiarly within its control and under its management,
calling for unwearying and vigilant attention and super-
vision.  While switches are, in a very material sense, always
danger points, yet common observation teaches us that, when
they are properly operated and cared for, engines and trains
ordinarily pass over them in safety.  When, therefore, it is
shown that the switch here in question was in fact misplaced
and unattended, at a time when the train pulled by intestate's
engine was due to arrive, we see no escape from the conclu-
sion that, in the language of the English court, "it affords
reasonable evidence, in the absence of explanation by the
defendants, that the accident arose from want of care."
*Scott v. Docks Co.,* supra.

In principle, quite like the case at bar is *Jones v. Kansas
City, F. S. & M. R. Co.,* 178 Mo. 528 (77 S. W. 890).  There,
a locomotive engineer was killed in a collision between his
engine and a freight car, which had been left standing on a
side track, but had in some manner escaped and moved out
upon the main line, over which the train of the deceased
was rightfully operated.  In sustaining a recovery of damages,
although the defendant sought to show the exercise of due
care on its part, the court says:

"It is not a usual and ordinary occurrence in a prudently
managed business for cars to be found running loose in that
manner; it does not ordinarily occur unless someone has
neglected his duty; and it is not, therefore, a risk assumed
by the servant.  And since it is not likely to happen in the

orderly course of business, when it does happen and a servant is injured in consequence, it calls for an explanation."

In *Edgerton v. New York & H. R. Co.,* 39 N. Y. 227, Mr. Justice Grover says:

"Whenever a car or train leaves the track, it proves that either the track or machinery or some portion thereof is not in proper condition, or that the machinery is not properly operated, and presumptively proves that the defendant, whose duty it is to keep the track and machinery in proper condition and to operate it with the necessary prudence and care, has in some respect violated this duty."

It is probable that this statement, literally construed, is a little stronger or more unqualified than the precedents generally will justify; but it embodies the essential principle.

The cases cited sufficiently illustrate the general nature and effect of the rule. In a few jurisdictions, there has been a disposition to restrict its application to cases between passengers and carrier, and deny its application as between master and servant; but the better and much the greater weight of modern authority, while in some degree narrowing the scope of the rule in the latter instance, does not deny its applicability in favor of the servant in a proper case. *Huggard v. Glucose Sugar Ref. Co.,* 132 Iowa 724; *Winkelmann & Brown Drug Co. v. Colloday,* 88 Md. 78; *Pittsburg, C. C. & St. L. R. Co. v. Campbell,* 116 Ill. App. 356; *McCray v. Galveston, H. & S. A. R. Co.,* 89 Tex. 168; *Folk v. Schaeffer,* 186 Pa. 253; *Jones v. Kansas City, F. S. & M. R. Co.,* 178 Mo. 528, 543; *Samuels v. McKesson,* 99 N. Y. Supp. 294; *Coleman v. Mechanics' Iron Foundry,* 168 Mass. 254; *Houston v. Brush,* 66 Vt. 331; *Droney v. Doherty,* 186 Mass. 205; *Wright v. Southern R. Co.,* 127 N. C. 225, 227; *Griffin v. Boston & A. R. Co.,* 148 Mass. 143; *Graham v. Badger,* 164 Mass. 42; *Rose v. Stephens,* 11 Fed. 438; *Howe v. Northern Pac. R. Co.,* 30 Wash. 569; *La Fernier v. Wrecking Co.,* 129 Mich. 596; *Cox v. Providence Gas Co.,* 17 R. I. 199; *McLean v. Pere Marquette R. Co.,* 137 Mich. 482; *Cahill v. Illinois Cent. R. Co.,*

148 Iowa 241; *Riley v. Cudahy Packing Co.*, 82 Neb. 319; *Lipsky v. C. Reiss Coal Co.*, 136 Wis. 307.

Indeed, it may be said now to be quite generally held that the application of the principle embodied in the *res ipsa* maxim does not depend upon the relation between the parties, whether contractual or otherwise, except so far as that relation defines the measure of duty imposed by law on the defendant. *Marceau v. Rutland R. Co.* (N. Y.), 105 N. E. 206; *Griffen v. Manice*, 166 N. Y. 188; 2 Cooley on Torts (3d Ed.) *799.

It may also be said in this connection that the principal reason formerly advanced in support of the argument against the application of the maxim in favor of a servant against his master, was that the negligence, if any could be presumed, was as likely to be that of a fellow servant as of a master; but where, as in this state, the fellow-servant rule has been abolished in favor of those employed in operating a railway, the force of the argument for such restriction is correspondingly lessened. We do not overlook *Brownfield v. Chicago, R. I. & P. R. Co.*, 107 Iowa 254, *O'Connor v. Illinois Cent. R. Co.*, 83 Iowa 105, *Helgeson v. Higley Co.*, 148 Iowa 587, and others of that class. None of these cases is inconsistent with the foregoing discussion. None undertakes to say more than that, in all cases where a servant charges his master with negligence, the burden is always upon him to make good by a preponderance of evidence, and that mere proof of the accident, with nothing more, is insufficient for that purpose. To that proposition, we still give our unqualified adherence. If, however, to the happening of the accident and injury is added evidence that it was attended with circumstances fairly justifying the inference that it would not have occurred, had defendant been exercising due care to maintain a safe track and protect the lives of trainmen thereon, then, under the rule we here approve, plaintiff has made a case for the jury on the issue of negligence. Indeed,

as construed and applied by the New York court, this is the extent of the *res ipsa* doctrine. *Griffen v. Manice,* 166 N. Y. 188; *Marceau v. Rutland R. Co.* (N. Y.), 105 N. E. 206, 207.

In the last cited case, the court says of the maxim:

"It is merely a sort of way of saying that the circumstances attendant upon the accident are themselves of such a character as to justify the conclusion that it was caused by negligence. The inference of negligence is deducible, not from the mere happening of the accident, but from the attendant circumstances."

The action in that case was by a locomotive fireman for an injury from a sudden expulsion of hot water from the boiler into the cab where plaintiff was at work. In sustaining a recovery, the court further says, quoting with approval from a former decision, *Breen v. New York Cent. & H. R. R. Co.,* 109 N. Y. 297:

"There must be reasonable evidence of negligence; but when the thing causing the injury is shown to be under the control of the defendant and the accident is such as, in the ordinary course of business, does not happen if reasonable care be used, it does, in the absence of explanation by the defendant, afford sufficient evidence that the accident arose from want of due care on its part."

There is nothing in any of our cases to which this proposition runs counter. It is possible that the *res ipsa* doctrine, when applied to cases between carrier and passenger, has been carried in some instances to the extreme limit of holding proof of the mere fact of accident or injury sufficient, without more, to put the carrier upon its defense; but, without in any way criticising such precedents, we need not go further here than to say that, in its application to cases between master and servant, the statement of the rule by the New York and many other courts, including our own, as hereinbefore pointed out, seems to be just in principle and well supported in precedent. We therefore hold, as already indicated, that the testimony offered in his behalf made a prima-facie case for the plaintiff.

This prima-facie case being made, it was incumbent upon the defendant to rebut, either by disproof of the facts testified to by plaintiff's witnesses, or by such reasonable explanation as would relieve itself from any presumption or inference of want of due care. Was this done? The question thus presented was also for the jury. Precedents may be found where courts have assumed to hold that an employer's rebuttal in such cases is sufficient, as a matter of law, to overcome plaintiff's prima-facie case; but it must be a very unusual case to justify such an interference with the functions of a jury. The contrary rule is thoroughly well established. It is true that defendant put upon the stand some of its servants and employes working in and about its yards at Oelwein, and they testified in substance that they had been diligent in looking after the tracks and switches; that the switch in question had generally been kept closed; and that they did not know how it became misplaced. They also showed that, but a short time before the accident, a lone engine had been run over the same track in safety, and without disclosing anything wrong with the switch. Upon this showing, it is contended as a matter of law that a verdict should have been directed for the defendant, and that a new trial should be now granted. For reasons just stated, we cannot so hold. The question thus presented was recently before the Court of Appeals of the District of Columbia. Plaintiff having made a prima-facie case under the *res ipsa* doctrine, defendant introduced witnesses to show that the injury complained of was purely accidental, and that there was no lack of proper care. Upon the question whether the explanation was sufficient to exonerate the defendant, the court says:

"Assuming that the defendant's explanation, if well founded in fact, was sufficient in law to rebut the presumption of negligence, yet the question remains whether it *was well founded* in fact. Now it is not for the court to deter-

2. MASTER AND SERVANT: action for negligence: prima-facie case: negligence: evidence of care: ultimate question for jury.

mine the truth of the explanation given; that is peculiarly the province of the jury. . . . It does not follow that, because an explanation is sufficient in law, it is therefore true; nor does it follow that, because it is true, it is sufficient to exonerate the defendant. The explanation may be true as far as it goes, and yet may not be sufficient to overcome the presumption of negligence raised from the circumstances of the accident. The case is not one of uncontroverted testimony on the one side and no testimony . . . on the other side. It is a case of testimony of circumstances on the one side from which negligence may be inferred and testimony of circumstances on the other side from which it may be inferred that there was no negligence. This undoubtedly makes a case for submission to the jury." *Kohner v. Capital Traction Co.,* 22 App. D. C. 181.

To the same effect is *Seybolt v. New York, L. E. & W. R. Co.,* 95 N. Y. 562. There, the deceased was killed by reason of a switch's being misplaced, sending the train into a collision on a sidetrack. In an action for the recovery of damages, the administrator proved the circumstances of the accident, making a prima-facie case substantially as was done in this case. The defendant thereupon introduced numerous witnesses to show its careful and skillful management, the sufficiency of its equipment, and its proper care and inspection, and sought to show that the wreck was caused by a broken axle, concerning which it had exercised due care. The court, after describing the wreck, says:

"These circumstances afforded a strong presumption that the train was diverted from the main track by some disarrangement of the switch. No adequate cause for the various circumstances appeared in evidence except that afforded by the presumption of a misplaced switch. Notwithstanding the positive evidence of witnesses to the effect that, at different times during the few hours preceding the accident, they had examined these switches and found them properly

set and locked, there was sufficient evidence derivable from the undisputed facts and the conflicting statements as to the situation of the connecting rails of the side track after the accident, to afford support for the inference probably drawn by the jury.''

So, too, in Wisconsin, where the maxim _res ipsa loquitur_ has at times been given only hesitating recognition, we find an interesting discussion by Dodge, J., of the effect of the defendant's evidence in rebuttal of the inference of negligence. See _Lipsky v. C. Reiss Coal Co._ (Wis.), 117 N. W. 803. The court there sums up its views in these words:

''The inference of negligence which, in a proper case, may be drawn from the accident itself _is_ one of fact, and the authority of the jury to decide whether it should be drawn can be`excluded only in the presence of undisputed proof—not merely testimony—that such negligence did not occur.''

In _Volkmar v. Manhattan R. Co._, 134 N. Y. 418, a case involving the same question, the defendant having by its employes given evidence of due care, the court, in refusing to hold the conclusiveness of this showing, makes use of this language, which we deem very pertinent to the case before us:

''But even if this evidence was sufficient to remove the presumption as held by the general term, the credibility of the witness would still be involved and be a question for the jury. This witness was defendant's track walker. It was his duty to examine the bolt which was broken. If there was any negligence with which the defendant was chargeable, it was that of this witness. He was, therefore, a person interested, and possibly actuated by a motive to shield himself from blame.''

The case of _Mullen v. St. John_, 57 N. Y. 567, is also in point. There, the trial court, after instructing the jury in accordance with the _res ipsa_ doctrine and the sufficiency of such showing in the absence of explanation by the defendant, added that ''it is for the jury to say, under all the circum-

stances, whether that explanation on the part of defendants is reasonably made." On appeal, the instruction was held correct. Following in the same line is *Rose v. Minneapolis, St. P. & S. Ste. M. R. Co.,* 121 Minn. 363. In that case, the plaintiff was injured by reason of the breaking of the air brake hose, the effect of which was to stop the moving train very suddenly. There was some evidence, also, of the existence of a defect in the hose. The court says the evidence in this respect was not strong, but adds:

"Whether all this evidence was, standing alone, sufficient to take the issue to the jury, we need not determine. We are clear that the rule of *res ipsa loquitur* applies and, aided thereby, the conclusion of the jury is sufficiently supported."

There also, as in this case, the defendant offered evidence of its care, oversight, tests and inspection tending to rebut the inference of negligence on its part; and it was held that, on the evidence, "the question whether the tests made were sufficient and adequate for the purposes of safety was one of fact for the jury." Other cases holding to the same rule or having the same trend are very numerous.

But, even if we were to hold that the showing in rebuttal of the inference of negligence may be made so clear and strong that the court will say, as a matter of law, that plaintiff's prima-facie case has been overcome, we should still be compelled to say that the defense in this case is not of that conclusive character. The evidence tends to show that defendant's yards at Oelwein are quite extensive, covering a large area of ground, with side tracks aggregating over 40 miles in length, upon which there are scores of switches for the convenience of the network of tracks. The switch in question is at the extreme southern border of the yards, and would seem to be used less frequently than many of those farther north. Employed upon the yards are four switching crews, of five men each. The section foreman at that point has a hundred or more men under his management. A key

fitting all the switch locks appears to have generally been carried by switchmen and trackmen, and there is some testimony tending to show that other employes were so furnished. One of the witnesses for the defense was its superintendent in charge, who described the general location and character of the yards, and his inspection of the switch after the accident. He says that generally the switch was opened and used about twice in 24 hours, once for the purpose of turning or reversing the train on which the deceased was employed, and again for a similar service during the night. He says, also, that, about 15 minutes before the accident, another engine coming from that direction arrived at the station. He did not see or make any inspection of the switch before the accident. The section foreman also testified that he and his crew had no work in that vicinity on the day in question, and neither locked nor unlocked the switch. A trackwalker was employed under this foreman's supervision, whose duty it was to go over the track, inspect its condition, and make report thereon; and on this day, the trackwalker was on duty. The trackwalker, being then examined as a witness, said he walked the track that day, and passed the switch about an hour before the accident, and observed it as he passed, and that "it was lined up right for the main line." He does not say that he stopped in his walk for that purpose, but appears to have satisfied himself by a glance, as he walked south between the rails and back again on the north side of the track. He says, "I did not go over to the switch," but adds that he noticed that the lock was in the "eye" made for that purpose. Three of the foremen of the switch crews testified, each saying in substance that his work was principally at a distance from this switch, and that neither he nor any of his crew was near or had anything to do with it during the 24 hours preceding the accident. The foreman of the crew who used this track for turning passenger trains says he used it for the last time on the preceding afternoon, and that neither

he nor any of his men left it open.  Other witnesses used
were examined as to other matters, none of them having any
knowledge of the condition of the switch until after the wreck
occurred, unless we except the fireman who brought the lone
engine in from the south over this track, a quarter of an
hour before deceased arrived with his train.  This witness
says little more than that he was at his place on the engine,
and adds:

"We went over the switch all right and noticed nothing
particular about it.  There was nothing about this switch
that attracted my attention one way or the other.  We look
at all switches before passing over them.  We were running
about ten miles an hour."

No witness connected with the service says that the
switch was locked or had been locked since it was admittedly
used 24 hours before.  Gibbons, the foreman who used it on
the preceding afternoon, and who is the last man who admits
having used it prior to the wreck, says no more than:  "I
did not leave that switch open, nor did any member of our
crew leave it open."  The trackwalker, who was the only one
testifying who had opportunity to inspect the switch, says
that, when he passed it, it was lined up all right for the
the main line.  This may have been true, and the switch have
been unlocked.  The most favorable construction which can
be put upon his testimony with reference to the lock is that,
as he passed, he saw the lock with its ring hanging in the
eye; but that is the very position in which it was found
after the wreck, when the switch was admittedly unlocked
and misplaced.  There is no showing of any order or rule
of the defendant requiring it to be locked or kept locked.
The most that appears in this respect is by the foreman
under whom the trackwalker worked, and the extent of his
affirmation is:  "We generally kept the main line switches
locked.  Did not lock the branch switches at all."  There was
no evidence tending to show that any unauthorized or evil
disposed persons were seen at or about the switch.  The only

persons known to have been in or about the yard and switch were the agents and employes of the defendant having the premises in its exclusive control, and bound to all reasonable diligence in keeping them in a safe condition. Under these circumstances, and the law as we have defined it, the plaintiff was not required to negative by direct or affirmative evidence the possibility that the switch was opened by a trespasser. If the circumstances were such—and we hold that they were—as would justify the inference that the negligence was that of the defendant or its employes, rather than occasioned by the interference of some other person unknown, it was sufficient for plaintiff's prima-facie case.

In this connection, we may notice the circumstance very largely relied upon by defendant, that the train which was wrecked had been preceded by a lone engine, which passed the switch in safety. The fact affords a legitimate argument in support of defendant's contention that the switch must have opened within the last quarter of an hour preceding the approach of the train. But such inference does not appear to us by any means conclusive. Referring to the description of the switch stand, it is manifest that, if the plunger were lifted from the socket, a very slight movement of the lever would leave it resting on the top, with no effective restraint to hold the switch points in place. Now if there was no hard and fast rule requiring the switch to be locked (and this is a fair inference), it was easily possible for the last employe of the defendant using the switch and having finished the work to hastily swing back the lever into place, as he supposed, for the plunger to work, then drop the lever and hasten away after his car, without attempting to lock it, believing in good faith that the switch was safely closed, when, in fact, the plunger, missing the socket, rested on top of the stand, leaving the movable rails without any effective restraint to hold them in place. The closer the plunger to the socket, the closer the switch points would be to the fixed rail, the less apparent the danger, but the more likely that

a passing engine might pass over the switch without derail-
ment. If left in this condition, it would seem to a reader
of the record by no means impossible that the, lone engine
might have passed the switch in safety, and yet by its move-
ment, or by the jar or vibration resulting therefrom, caused
the unfastened switch points to move farther away from the
rail and render the passage of the later train much more
perilous. Of course, in saying this, the court does not under-
take to find the fact, and we mention it only as illustrating
the unsoundness of defendant's insistence that it is shown
beyond question that the switch was closed and locked when
the engine passed. On the contrary, we think the jury was
justified in finding that the unfastened condition of the switch
had continued a much longer period. We therefore hold that
the trial court did not err in refusing to hold as a matter
of law that there was no evidence on which the jury could
find the defendant negligent.

II. Exceptions were preserved to the admission of cer-
tain testimony concerning the giving out of switch keys by
defendant to its employes, because it is said that the witness

**3. APPEAL AND ER-
ROR: harmless
error: imma-
terial evidence
of conceded
fact.**

testifying referred to a time three years be-
fore the accident. Whatever of technical
merit there may have been in this objection
appears to have been neutralized and ren-
dered harmless by the concession of the defendant's witnesses
as to the practice prevailing at the time of the accident.

It is also complained that this kind of evidence, or some
of it, was drawn out of defendant's witnesses on cross-exam-
ination. So long as the evidence is pertinent to the issue being

**4. WITNESSES:
cross-examina-
tion: matters in
chief: discre-
tion of court.**

tried, it required a grave abuse of the trial
court's discretion in admitting the same on
cross-examination to justify a reversal of the
judgment appealed from. We cannot con-
ceive that defendant suffered any material prejudice in this
instance.

III. The deceased was injured March 27, 1910; the

original petition was filed April 11, 1911. It described the
defendant company as operating a line of railroad through
the states of Iowa, Illinois, Minnesota, Missouri and Kansas, and alleged that deceased
was injured while in charge of an engine
hauling a regular passenger train between
Des Moines and Oelwein, and demanded a
recovery of damages. To this, defendant demurred, on the
ground that the petition showed deceased to have been
engaged in interstate commerce, and no action for the recovery of damages would lie under the laws of Iowa. It was
also objected that no right of action survived the death of
the intestate. The demurrer being overruled, defendant
answered in denial, and pleaded contributory negligence on
the part of deceased. On October 13, 1913, more than two
years after the death, plaintiff amended the petition by
adding an allegation that deceased left a dependent wife, who
suffered pecuniary injury by his death, and that the action
was being prosecuted for her benefit. Thereupon, the defendant, in a motion to strike, raised the objection that the
amended petition stated an entirely new cause of action, and
was barred. The motion was overruled, and defendant
answered, denying the amended petition and pleading the
statute of limitations. The facts bearing upon the issue so
tendered are wholly without dispute, and, passing all merely
collateral questions, we come at once to the inquiry whether
this defense is available to the appellant.

5. LIMITATION OF
ACTIONS: commencement of
action: amendment presenting new cause
of action.

We are of the opinion that the statute of limitations
affords no defense in this case. The suit was originally
brought, and has ever since been maintained, by the administrator, who is the proper person to prosecute it, whether it
be maintainable under the law of the state or under the Federal Employers' Liability Act. The cause of action in either
case is the death of Spellman, occasioned by the alleged negligence of the defendant. In other words, whether the action
be brought in one form or the other, it is by the same party,

against the same party, in the same court, for damages for the same alleged wrong, the sole distinction being in the measure of damages to be recovered, and the person or beneficiary to whom the plaintiff must account for the damages, if any, which he collects. Now, assuming that plaintiff seeks to recover under the statute of the state and alleges a good cause of action, but, before the case is brought to trial, or even pending the trial, it develops that the deceased was injured while engaged in interstate commerce, and that, to sustain a verdict in favor of the administrator, the petition should allege that he was survived by a dependent wife or family, an amendment to the petition adding such necessary averment does not, in the judgment of the court, state a new cause of action permitting the defendant to successfully interpose a plea of the statute of limitations. Such is the logical and necessary effect of our own holdings. *Cahill v. Illinois Cent. R. Co.,* 137 Iowa 577; *Benson v. City of Ottumwa,* 143 Iowa 349; *Kuhns v. Wisconsin, I. & N. R. Co.,* 76 Iowa 68; *Myers v. Chicago, B. & Q. R. Co.,* 152 Iowa 330; *Knight v. Moline, E. M. & W. R. Co.,* 160 Iowa 160, 166; *Padden v. Clark,* 124 Iowa 94, 96. In the *Cahill* case, and in many other cases, it has been held that, although a petition in a personal injury action is demurrable because of failure to make some material averment, it may be amended, even after the period of limitations has expired, between the commencement of the action and the filing of the amendment. See also *Myers v. Kirt,* 68 Iowa 124; *Bacon v. Iowa Cent. R. Co.,* 157 Iowa 493, 501. In the *Benson* case, the plaintiff, a minor, sought to recover damages for personal injuries resulting to himself. Later, and after the expiration of the period in which the statute permitted such actions to be brought without previous notice to the city, he filed amendments, increasing his claim, among which was a claim for damages sustained by the father for loss of plaintiff's services, the same having been assigned to him by the parent. It was held that the statutory limitation did not apply, this court

there saying that, the tort suffered by the son having resulted in loss of earnings to which the parent would have been entitled, the negligence on which the action was predicated was, nevertheless, negligence in reference to the minor, and *"the question as to the person entitled to have compensation for such injury was merely incidental."* Directly in point also seems to be the case of *Knight v. Moline, E. M. & W. R. Co.,* 160 Iowa 160. There, an action was brought to recover for the death of an intestate who was killed in Illinois, where the right of recovery, if any, was for the benefit of the dependent wife and children. The administrator brought action in this state, claiming damages generally for the estate, without alleging the existence of dependent relatives entitled thereto. He was allowed to amend his petition, even after verdict, by adding thereto the necessary omitted averments, without exposing the claim to the defense of the statute of limitations. It was there distinctly held that the statute of limitations was arrested or tolled by the beginning of the action, even though the petition as originally filed may have been demurrable. In this connection, the court says:

"The identity of the cause of action is not made to depend upon perfection of allegation, nor is the identity changed by the filing of a mere amendment. Though the petition be demurrable that fact does not lift the toll of the statute."

It is true that this rule does not seem to be recognized in a few jurisdictions, but it has the support of the weight of authority. *Missouri, K. & T. R. Co. v. McFadden,* 89 Tex. 138; *McKeighan v. Hopkins,* 19 Neb. 33; *Hillyer v. Douglass,* 56 Kans. 97; *Ross v. State,* 131 Ind. 548; *Middlesex Banking Co. v. Smith,* 83 Fed. 133; *Doe v. Littlefield,* 99 Me. 317; *City of Detroit v. Wayne Circuit Judge,* 125 Mich. 634. The Wisconsin court, as recently as February 22d of the present year, had under consideration the question presented by this appeal. *Curtice v. Chicago & N. W. R. Co.* (Wis.), 156 N. W. 484. The plaintiff brought an action

against a railway company to recover damages for personal injury, his complaint being in the usual form for recovery under the law of that state. The defendant, in answer, alleged that the injury, if any, occurred while plaintiff, as a servant of the company, was engaged in a work of interstate commerce; wherefore the action under the law of the state should be abated. After this issue had been raised, plaintiff was permitted to amend, and alleged facts showing that, at the time of his injury, his employer was a common carrier engaged in interstate commerce, and that he was then so engaged in its service. To this, the defendant responded with a plea of the statute of limitations, and, the plea being upheld by the trial court, the action was dismissed. On appeal, the judgment below was reversed, Kerwin, J., writing the opinion for the majority. He says:

"It is obvious that but one cause of action existed upon all the facts stated in the amended complaint. It is equally obvious that the original complaint was defective in failing to state certain facts going to show that at the time the injury was sustained the parties were engaged in interstate commerce. Nothing stated in the amended complaint was in conflict with the allegations of the original complaint. The cause of action upon which the plaintiff sought to recover damages was defectively stated in the original complaint, and the defects were cured by the amendment. But one cause of action was stated. The amendment related back to the original complaint and became a part of it; hence the statute of limitations was no defense. *Missouri, K. & T. R. Co. v. Wulf*, 226 U. S. 570; *Gainesville M. Ry. v. Vandiver*, 141 Ga. 350; *Bixler v. Pennsylvania R. Co.*, 201 Fed. 553; *Smith v. Atlantic C. L. R. Co.*, 210 Fed. 761; *Cincinnati, N. O. & T. P. R. Co. v. Goode*, 163 Ky. 60; *Vickery v. R. Co.*, 87 Conn. 634; *Schieffelin v. Whipple*, 10 Wis. 81; *Callahan v. Chicago & N. W. R. Co.* (Wis.), 154 N. W. 449."

The court further says:

"The learned trial judge below seems to have attached

importance to the fact that counsel for appellant stated that he intended to state a cause of action under the state law. We think this statement wholly immaterial. The mental operations of counsel could not create two causes of action where but one existed. The intent of the pleader might be significant or helpful in giving construction to an allegation which was ambiguous or of doubtful meaning. But there is no such question here. There is another feature of this case which is worthy of notice. When the defendant answered the original complaint it set up the facts which were omitted in the plaintiff's defective complaint and necessary to perfect the cause of action under the Federal act, and which were afterwards set up by plaintiff in the amendment complained of. The defendant was therefore in no way surprised or prejudiced by the amendment. Doubtless the case could have gone to trial on the pleadings as originally framed, and the complaint on the trial amended or treated as amended in accordance with the issues made by the pleadings as originally framed. *Callahan v. Chicago & N. W. R. Co.* (Wis.), 154 N. W. 449; *Bieri v. Fonger,* 139 Wis. 150; *Graber v. Duluth S. S. & A. R. Co.,* 159 Wis. 414; *Wabash R. R. v. Hayes,* 234 U. S. 86.''

In this connection, we also call attention to the case of *Vickery v. New London N. R. Co.* (Conn.), 89 Atl. 277, a recent decision by the Connecticut court. There also the defendant was allowed to amend to bring his action under the Federal statute, and it was held not to be a statement of a new cause of action. Our statute, Code Section 3600, is exceedingly liberal in its terms, allowing a party, in furtherance of justice, to amend his *pleadings* or *proceedings* by correcting a mistake ''in any respect,'' or by inserting ''other allegations material to the case.'' It also allows him to amend his pleading or proceeding, even after proof is offered, to conform them to the facts proved, so long as he does not substantially change the claim or defense. That the amendment here considered does not introduce any new cause of action,

we think is abundantly sustained by the authorities.

IV. Counsel argue that deceased was guilty of contributory negligence as a matter of law. There is no merit in this contention. The evidence shows that both fireman and

6. **Negligence: contributory negligence: open switch: right of engineer.**

engineer were maintaining the usual lookout; that nothing wrong in the appearance of the switch attracted their attention until they were within 200 feet of it; and that their efforts to stop in time were then unavailing. It is conceded that, even after the wreck took place, the danger signal upon the switch post was only partially displayed, and the jury could rightfully infer that this fact reasonably accounted for the failure of the engine men sooner to discover it. Moreover, while it was their duty to maintain a proper lookout, they had the right to believe that the defendant and its servants were doing their duty in maintaining the track in a reasonably safe condition for their use; and it is not for the court to say that reasonable care on their part required them to approach the switch prepared to stop instantly upon discovering their danger. Indeed, had the jury affirmatively found the deceased negligent in this respect, it would be difficult to find support therefor in the record.

V. Most of the assignments of error predicated upon instructions given and refused, when tested by the rules of law affirmed in this opinion, do not appear to have been well taken; and, so far as any of them raise any questions other than those already construed and passed upon, we find that the language used by the trial court is not open to the criticisms made against it.

VI. It is finally said that the verdict is excessive. Defendant was an experienced engineer, earning $175 a month. He was a man in good health, with an expectancy of life of

7. **Trial: verdict: excessiveness: $11,150.**

13½ years. It was his practice to turn his wages over to his wife, and he is not shown to have been a man of intemperate or wasteful habits. The wife was left a widow at 52 years of age,

and the verdict in her favor was $11,150. As has often been said, in cases of this nature there is no fixed or exact rule for measuring the value of a human life or the damages resulting from its loss, to the estate of the deceased or to his dependents, who have been deprived of his support. Its estimate is peculiarly for the jury, and the court should not interfere with it, save where its extravagance is so great or so marked as to clearly indicate passion or prejudice. The record here is not of that character, and we cannot interfere with the verdict.

We find no error calling for a reversal of the judgment of the district court, and it is therefore—*Affirmed.*

DEEMER, GAYNOR and PRESTON, JJ., concur.